**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

LOUIE NABONG,
c/o Orrick, Herrington & Sutcliffe LLP
1152 15th Street, NW
Washington, DC 20005,

          Plaintiff,

    v.

OFELIA PADDAYUMAN,
6109 Lundy Place
Burke, VA 22015,

and MARIA CRISTINA LOUISE SY,
12103 Green Leaf Court
Fairfax, VA 22033,

          Defendants.

Case No. _____

**JURY TRIAL DEMANDED**

**COMPLAINT**

Plaintiff Louie Entretinga Nabong ("Plaintiff" or "Ms. Nabong"), by and through her undersigned attorneys, with personal knowledge as to herself and her actions and otherwise on information and belief, hereby alleges as follows:

**INTRODUCTION**

1.    This action is brought under the Trafficking Victims Protection Reauthorization Act of 2003 (the "TVPRA") and other state and federal laws to seek just compensation for a victim of human trafficking, Louie Nabong.

2.    Defendants Ofelia Paddayuman ("Paddayuman") and Maria Cristina Louise Sy ("Sy") exploited the resources available to them as employees of the World Bank Group to lure Ms. Nabong into the United States and force her into involuntary servitude.  They deceived Ms.

Nabong into leaving her family in the Philippines, including her six-year-old son, through the false promise of a rewarding job, a good salary, and a safe home. She received none of these things. Instead, she was forced to work grueling hours as a servant for her traffickers, without breaks or days off. She received only a small fraction of the compensation to which she was entitled. She was intimidated into submission, isolated from society, and kept in virtual captivity in her traffickers' house through constant threats and surveillance. She suffered a traumatic sexual assault and constant sexual harassment carried out by Paddayuman's husband. Ms. Nabong endured all this because of the actions of Defendants, who took advantage of her desire to create a better life for herself and her son and enticed her to come to the United States with every intent to force her into servitude once she arrived.

3. Ms. Nabong trusted Defendants to help her attain that better life, and so she followed Paddayuman's instructions and guidance in applying for a G-5 visa and gratefully accepted Paddayuman's offer to make the necessary arrangements for her move to the United States. Little did Ms. Nabong know that this generous offer was designed to trick Ms. Nabong into coming to the United States so that Defendants could subject her to a modern-day form of slavery.

4. Human trafficking affects victims, like Ms. Nabong, who are forced, defrauded, or coerced into labor exploitation. Domestic workers who come to the United States on special visas, including the G-5 visas reserved for those who work for employees of international organizations, are especially vulnerable. "The special visa programs for domestic workers are conducive to and facilitate the violation of the workers' human rights," and as far back as 2001 Human Rights Watch reported that domestic workers were being trafficked and abused by international organization officials at an astounding and unacceptable rate. Human Rights

Watch, *Hidden in the Home:  Abuse of Domestic Workers with Special Visas in the United States* (2001), *available at* https://www.hrw.org/reports/2001/usadom/usadom0501.pdf.

5.      Plaintiff brings this civil action under the TVPRA[1], the Fair Labor Standards Act of 1938 (the "FLSA"), the Virginia Minimum Wage Act, Virginia statutory labor and employment law, and state common law.  By this Complaint, Plaintiff seeks redress for egregious violations of her basic human and civil rights.

## JURISDICTION AND VENUE

6.      Jurisdiction of the subject matter of this action is established under 28 U.S.C. § 1331, the TVPRA, 18 U.S.C. § 1589 *et. seq.*, and the FLSA, 29 U.S.C. § 210 *et. seq.*

7.      This Court has supplemental jurisdiction over the related state law claims asserted herein under the doctrine of pendent jurisdiction and pursuant to 28 U.S.C. § 1367. Supplemental jurisdiction over those claims exists because they arise from the same common nucleus of operative facts from which the federal claims arise.

8.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this district.  In particular the preparation of Plaintiffs' immigration and employment documents, application for and processing of Plaintiffs' G-5 visa, and Paddayuman's communications with Plaintiff regarding her employment and move to the United States occurred at the International Finance Corporation ("IFC"), a member organization of the World Bank Group, in Washington, D.C.

---

[1] The TVPRA establishes a private cause of action for trafficking victims like Ms. Nabong.

## PARTIES

9.      Plaintiff Louie Nabong is, and at all relevant times was, a citizen of the Philippines.  She resided in Burke, Virginia from the time of her arrival in the United States on March 24, 2014 until May 6, 2014.  Since then, Ms. Nabong has resided in Maryland.

10.      Upon information and belief, Defendant Ofelia Paddayuman is or was a citizen of the Philippines and is or was an employee of the IFC in Washington, D.C.  At all relevant times, she resided at 6109 Lundy Place, Burke, Virginia 22015.

11.      Upon information and belief, Defendant Maria Cristina Louise Sy is a citizen of the Philippines.  She was born on June 23, 1965 and obtained a G-4 visa on March 11, 2011 as a Program Assistant on an open-ended (career) appointment with the IFC in Washington, D.C.  At all relevant times, she resided in Fairfax County, Virginia.

## FACTUAL ALLEGATIONS

### A.      Defendants Trafficked Ms. Nabong to the United States.

#### 1.      Paddayuman Met Ms. Nabong in the Philippines and Caused Her to Accept a Job in the United States Under False Pretenses.

12.      Plaintiff Louie Nabong was born on February 8, 1988 in Pasig City in the Philippines, and grew up in Taytay, Rizal in the Philippines.  She comes from a large family that still resides in the Philippines—she is the fourth oldest of five brothers and four sisters.  Her mother worked at a nail salon and her father was a printing press operator.

13.      Ms. Nabong is the single mother of a young son named Dane.  Dane's father ceased providing financial support for both Ms. Nabong and Dane several years ago.

14.      Ms. Nabong has worked to support her family since she was 16 years old.  While living in the Philippines, she worked at various times as a sales clerk, restaurant waitress,

cashier, and data entry clerk.  However, she sought more lucrative and rewarding employment in the United States to better provide for herself and her family.

15.     Paddayuman was a customer at the nail salon that employed Ms. Nabong's mother.  Paddayuman worked in the United States for the IFC, but is from the Philippines and maintained a house in Cainta, Rizal.  Paddayuman told Ms. Nabong's mother that she was looking for someone to work as a caretaker for her two grandchildren in the United States, and Ms. Nabong's mother stated that Ms. Nabong might be interested.

16.     Paddayuman contacted Ms. Nabong by telephone to discuss this job opportunity and informed her that the job was to provide in-home childcare to her two grandchildren. Paddayuman emphasized that Ms. Nabong's responsibilities would be limited to childcare and would not involve cleaning, laundry, or other housework.  Enticed by the prospect of a rewarding job in America, Ms. Nabong expressed interest in the position.  A short time later, Paddayuman informed Ms. Nabong that she had gotten the job.

**2.     Defendants Trafficked Ms. Nabong to the United States Using World Bank Processes and Resources, and Did So Using Falsified Documentation.**

17.     Paddayuman told Ms. Nabong that she would handle most of the paperwork associated with Ms. Nabong's admission to the United States.  She never explained to Ms. Nabong what the paperwork was or what it contained, and any time Ms. Nabong asked questions about it, Paddayuman would avoid providing an answer.  In fact, that paperwork was falsified by Paddayuman and Sy.

18.     Defendants orchestrated Ms. Nabong's entry into the United States on a G-5 visa, attached as Exhibit 1 to this Complaint.  A G-5 visa is a nonimmigrant visa which allows a foreign national to enter the United States as domestic or personal employee of a foreign employee of an international organization working in the United States under a G-4 visa.  G-5

visas are not available to domestic workers employed by United States citizens or green card

holders.  Although Paddayuman consistently told Ms. Nabong that she would work for

Paddayuman and her family, Defendants arranged to have Sy listed as Ms. Nabong's employer

on the visa.

19.     As the prospective domestic employee of Sy, a World Bank Group employee with

G-4 status, Ms. Nabong was ostensibly eligible for a G-5 visa.

20.     Paddayuman instructed Ms. Nabong to name Sy as her employer whenever

prompted, including during an interview with Untied States embassy officials that was conducted

as part of the application process.  Paddayuman did not tell Ms. Nabong why Sy should be listed

as her employer, and assured Ms. Nabong that she would make any necessary revisions to the

paperwork at a later time, including listing herself as Ms. Nabong's true employer.[2]  To this day,

Ms. Nabong has neither met Sy nor performed any work for her.

21.     Prior to or during the time the visa paperwork was prepared, Paddayuman also

asked Ms. Nabong to sign a blank piece of paper and send it to her.  Ms. Nabong complied,

trusting Paddayuman and believing this to be a standard request that was necessary to complete

her visa application.  The signature Ms. Nabong sent to Paddayuman likely was used to forge

Ms. Nabong's signature on the employment contract submitted with her visa application, as

explained below.

22.     Paddayuman provided Ms. Nabong with a sealed envelope prior to her interview

at the United States embassy and instructed her not to open it until the interview.  The envelope

---

[2] A letter was submitted in support of Ms. Nabong's visa application, attached as Exhibit 2 to this
Complaint.  This letter also listed Sy as Ms. Nabong's employer-to-be.  Sy forwarded this letter
by email to Paddayuman on February 4, 2014, demonstrating that Sy was at the very least aware
she was listed as Ms. Nabong's prospective employer on the G-5 visa application.

contained the documentation needed for her interview, including an employment contract (the "Contract," attached as Exhibit 3 to this Complaint), which Ms. Nabong had never read or seen. The Contract was dated January 21, 2014 and was already stamped and signed.  Ms. Nabong's purported signature was forged.  Sy had signed the Contract as Ms. Nabong's employer.

23.     Ms. Nabong received her visa on February 21, 2014, and traveled to the United States shortly thereafter, arriving by plane on March 24, 2014.  Paddayuman purchased Ms. Nabong's plane ticket.

**B.     After Trafficking Ms. Nabong to the United States, Paddayuman Subjected Ms. Nabong to Inhumane Conditions in Violation of Her Human and Civil Rights.**

**1.     Paddayuman Isolated Ms. Nabong From Society, Using Intimidation and Deceit to Keep Her Imprisoned in Her House.**

24.     While Ms. Nabong worked for Paddayuman, Paddayuman prevented her from interacting with anyone outside her family, and used lies and intimidation to keep her under involuntary house arrest and force her to endure brutal working conditions.

25.      Paddayuman deliberately used her position of power to compel Ms. Nabong to submit to captivity.  Paddayuman told her that she was not allowed to go outside the house by herself, even into the yard.[3]  Paddayuman enforced this rule through a pattern of activity intended to make Ms. Nabong believe that leaving the house or disobeying orders would result in serious harm to her, in the form of arrest, deportation, or even physical harm:

a.  First, at least two video cameras were installed in the house, and Paddayuman and her husband told Ms. Nabong that the video feeds from those cameras went to the police.  Paddayuman and her husband told Ms. Nabong that the police

---

[3] On the few occasions that Ms. Nabong left the house, she was always accompanied by one or more members of Paddayuman's family.

were constantly monitoring her actions, and if she violated the Paddayumans'

rules (e.g., ventured outside the house), the police would know and alert the

Paddayumans, and might even arrest her.

b.  Second, an alarm was installed by the front door of the house. Ms. Nabong was

not given the code to the alarm. Ms. Nabong understood this as a means for the

Paddayumans to prevent her from leaving the house and to be alerted if she did.

c.  Third, Paddayuman told Ms. Nabong that it was unsafe for her to venture

outside the house because of "bad people" around. New to this country, Ms.

Nabong accepted this as true.

d.  Fourth, Paddayuman told Ms. Nabong that, should she be caught doing anything

wrong, she would be deported back to the Philippines.

e.  Finally, Paddayuman told Ms. Nabong that she and her husband had powerful

friends and connections, and that they could use such connections to inflict

punishment on Ms. Nabong for any disobedience. For example, Ms. Nabong

was told that Paddayuman's husband was related to the Vice President of the

Philippines and was friends with many local police officers. The Paddayumans

also told her that they were connected with immigration and embassy officials,

and had other family and friends working in the government. Paddayuman

frequently reminded Ms. Nabong that she worked for the World Bank Group,

and had powerful connections through her employment there.

26.    Moreover, Paddayuman sought to ensure Ms. Nabong's continued captivity and

obedience by preventing her from interacting with anyone outside the family even while she was

inside the house. For example, while Ms. Nabong was forced to help prepare for and clean up

after parties hosted by the Paddayumans, she was confined to her bedroom during the parties so that no party guests would interact with her or even know she was there.

27.     Ms. Nabong had little ability to communicate with anyone outside the Paddayumans' home.  Her mobile phone from the Philippines could not be used to make calls in the United States, and it broke shortly after she arrived.  Ms. Nabong asked Paddayuman if she could buy a United States mobile phone, but she refused.  Ms. Nabong's primary contact with the outside world was via the internet on a tablet she was allowed to purchase with the limited income she received in cash.  While she used her tablet to communicate with her family in the Philippines, she had no family, friends, or other contacts in the United States with whom she could communicate.

### 2.      Paddayuman's Husband Sexually Assaulted Ms. Nabong and Subjected Her to Constant Sexual Harassment and Intimidation.

28.     Throughout the entire period Ms. Nabong was living with the Paddayuman's, Paddayuman's husband touched her inappropriately and without her consent, and directed inappropriate sexual remarks and innuendos towards her.  He frequently attempted to get Ms. Nabong alone with him, often by asking her to "go have a drink" or "go have a smoke," and occasionally entered her bedroom uninvited.  Whenever he walked by Ms. Nabong, he would try to make his body touch hers.  She was forced to endure this harassment almost daily.

29.     In April 2014, Paddayuman's husband attempted to film Ms. Nabong while she took a shower.  Ms. Nabong was entering the bathroom to shower when he told her to wait so that he could fix something.  He went into the shower and emerged moments later.  Ms. Nabong then entered the bathroom to find a video camera with a red blinking light placed near the sink with its lens pointed at the shower.  Not knowing what else to do, and with nobody in the house

to help her, Ms. Nabong placed a towel over the camera and proceeded to take a shower.  The next time Ms. Nabong went into the bathroom, the camera had been removed.

30.     The abuse reached its peak later that month, when he entered Ms. Nabong's bedroom after becoming inebriated at a party at the house.  He groped her breasts and ran his hands all over the rest of her body.  Ms. Nabong repeatedly told him to stop, but he would not relent.  It was only after Ms. Nabong threatened to yell that he ended his assault and left Ms. Nabong's room.

31.     Paddayuman's husband's actions, and Paddayuman's apparent disregard of those actions, left Ms. Nabong frightened and uncomfortable throughout her time working for Paddayuman.  From nearly the first day she arrived, she lived in constant fear of being harassed, assaulted, or raped by Paddayuman's husband.

### C.     Ms. Nabong Was Forced to Perform All Manners of Work for Incredibly Long Hours With No Breaks or Days Off.

32.     Paddayuman forced Ms. Nabong to work incredibly long and grueling hours, far exceeding what she was promised and what could possibly be considered humane.  Most days, she began working at 6 a.m. and would often continue without a break until 10 p.m.  She was told that any moment not spent caring for Paddayuman's grandchildren was to be spent cooking, cleaning, doing laundry, or performing the various other household tasks the Paddayumans demanded of her.

33.     Ms. Nabong was forced to work each and every weekend day until she was able to escape her situation, laboring under the same arduous routine as she did on weekdays.

34.     This taxing schedule was nothing close to what Ms. Nabong discussed with Paddayuman or what was promised in the Contract.  Paddayuman initially told Ms. Nabong that

her work day would last from 8 a.m. to 4 p.m., and that she would have weekends off.  Under the Contract, Ms. Nabong was to work only from 9 a.m. to 4 p.m. and have weekends off.

35.     The Contract additionally provided that Ms. Nabong was entitled to three holidays per year with pay, seven sick days per year with pay, and fourteen vacation days per year with pay.

36.     Ms. Nabong asked Paddayuman for days off, but she always denied her requests. She also confronted Paddayuman about the additional hours she was forced to work, but was consistently rebuffed.

37.     Moreover, Paddayuman required Ms. Nabong to complete tasks far outside the scope of what she was told when she agreed to leave her family to work in the United States.  As noted above, Paddayuman told Ms. Nabong that her job responsibilities would consist of caring for her grandchildren.  The Contract likewise stated:  "in accordance with the terms and conditions of this Contract, the Employer agrees to employ the Employee at or in connection with the Employer's residence in the position(s) of caretaker/babysitter."[4]

38.     Ms. Nabong did, in fact, care for Paddayuman's grandchildren.  However, childcare was only one of many tasks she was required to perform.  Ms. Nabong was also forced to spend long hours cleaning, cooking, doing laundry, and performing various other household tasks, including preparing for numerous parties hosted by the Paddayumans.

39.     Ms. Nabong was also tasked with cleaning the nearby house of Paddayuman's daughter.

---

[4] The Contract further elaborated that Ms. Nabong would be asked "[t]o assist with father who has history of heart and lung illness and loss of hearing" and "assist children in their care." However, Paddayuman had never before told Ms. Nabong that her job responsibilities would also include care for the "father."

40.     In addition, Ms. Nabong was required to assist Paddayuman and her husband with their catering business.  The Paddayumans prepared and sold food to be served at local parties or other events.  They catered events almost every week, and often filled multiple food orders in a single week.  Ms. Nabong was forced to help cook the food they sold and assist with deliveries.

41.     Despite all of her hard work, the Paddayumans treated Ms. Nabong cruelly.  They frequently insulted her and screamed at her if they wanted something.  She was subjected to their anger and insults any time she did something incorrectly or too slowly for their liking.  Ms. Nabong found this cruelty incredibly upsetting and difficult to bear.

**D.     Paddayuman Did Not Adequately Compensate Ms. Nabong For The Work She Performed.**

42.     Additionally, Ms. Nabong's compensation was grossly inadequate compared to what she was promised and the amount she worked.

43.     The Contract provided that Ms. Nabong would be compensated at a rate of $8.98 per hour for all working hours, that she would be "paid by check or electronic fund transfer to [her] bank account, on either a weekly or biweekly basis," and that "copies of pay records will be provided without charge to [her]."  She was also to be paid this rate for any "overtime hours" worked.

44.     An Embassy of the Philippines Employment Documents Verification Form confirms the wages promised to Ms. Nabong in the Contract.[5]

45.     Paddayuman never paid Ms. Nabong anything for her services.  Paddayuman's daughters together paid Ms. Nabong $500 for her first month of work.  One payment was made

_____

[5] Separate and apart from the Contract, Paddayuman orally promised Ms. Nabong that she would receive $1,000 per month in exchange for her services caring for her grandchildren. Paddayuman said she would personally pay Ms. Nabong $500 each month, and two of Paddayuman's daughters would together pay the other $500 each month.

by check, which Ms. Nabong was unable to deposit because she did not have a bank account in the United States.  Paddayuman never made any payments to Ms. Nabong in accordance with the hourly rate specified in the Contract.

46.     After Ms. Nabong received her initial payment from Paddayuman's daughters, Paddayuman demanded $100 of that sum as partial reimbursement for the cost of Ms. Nabong's flight to the United States and household services certification.

47.     However, Ms. Nabong's Contract provides that "[t]he Employee will be provided with transportation, at no cost to the Employee, to the U.S. at the beginning of employment and from the U.S. after termination of employment (for any reason)."  The Embassy of the Philippines Employment Documents Verification Form likewise confirms that Ms. Nabong's employers were to provide "free transportation from the point of hire to the site of employment and return."

**E.     Ms. Nabong Finally Escaped From Paddayuman After Contacting GABRIELA DC.**

48.     Paddayuman used deceit and intimidation to prevent Ms. Nabong from seeking help or extricating herself from the situation.  Housebound and shielded from the public, Ms. Nabong had no local friends or neighbors to whom she could reach out for help.  She felt that she was unable to call the police because the Paddayumans had told her that Paddayuman's husband was friends with many policemen.  The Paddayumans would even quickly change the television station if an advertisement for a lawyer aired, which Ms. Nabong understood as a means of preventing her from obtaining help or legal recourse.

49.     Notably, once a domestic worker leaves her employment situation, she loses G-5 status and risks being placed in removal proceedings for deportation.  To try and escape her situation would be to subject herself to deportation.  Despite the abuse she endured, Ms. Nabong

still sought a better life in the United States and wanted to stay so as to earn enough money to bring her son Dane to the United States to be with her.

50.     After enduring Paddayuman and her family's mistreatment and abuse for weeks, and fearing that Paddayuman's husband's assaults would escalate to rape or other physical harm, Ms. Nabong finally reached a breaking point.  In early April, she reached out to a distant connection in Canada via Facebook for help.  That individual encouraged Ms. Nabong to contact GABRIELA DC, a member organization of the United States chapter of the GABRIELA National Alliance of Women.  GABRIELA DC is an organization dedicated to waging a struggle for the liberation of oppressed Filipino women, and campaigns for issues such as women's rights, gender discrimination, violence against women, and women's health and reproductive rights.

51.     Ms. Nabong posted a message on GABRIELA DC's Facebook page asking for help, and was able to communicate with Susan Pineda of GABRIELA DC regarding her situation.  GABRIELA DC then reached out to U.S. Immigration and Customs Enforcement ("ICE") on Ms. Nabong's behalf.

52.     ICE Special Agent Arrika Drew arrived at 6109 Lundy Place in Burke, Virginia on or about May 6, 2014 and rescued Ms. Nabong, removing her from the house over Paddayuman's objections.  Thereafter, Ms. Nabong moved in with the family of an individual she met through GABRIELA DC.

53.     Ms. Nabong hopes to remain in the United States and pursue a career as a nurse or caretaker for the elderly, through which she can earn enough money to bring her son Dane to the United States to live with her.  Ms. Nabong has not seen Dane in approximately three years.

54.     On July 12, 2016, Ms. Nabong applied for T nonimmigrant status for herself and Dane pursuant to the Trafficking Victims Protection Act of 2000.  That application was recently granted.

**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**

**Trafficking Victims Protection Reauthorization Act**
**Peonage**
**18 U.S.C. §§ 1581, 1595**
(Against both Defendants)

55.     Plaintiff restates and incorporates Paragraphs 1 through 55 of the Complaint as if fully stated herein.

56.     The peonage provision of the TVPRA, 18 U.S.C. § 1581(a), provides:  "Whoever holds or returns any person to a condition of peonage, or arrests any person with the intent of placing him in or returning him to a condition of peonage, shall be fined under this title or imprisoned not more than 20 years, or both."

57.     Paddayuman intentionally held Ms. Nabong against her will and obtained her labor and services through threats and intimidation.

58.     Paddayuman and Sy intentionally caused Ms. Nabong to be transported from the Philippines to the United States.  After Ms. Nabong arrived in the United States, Paddayuman told Ms. Nabong that she owned her money for her travel from the Philippines, and that she had every intention of having that debt repaid.

59.     Paddayuman intentionally withheld Ms. Nabong's rightfully earned wages from her and, through threats and intimidation, prevented her from seeking help or escaping her situation.

60.     Paddayuman's and Sy's conduct constituted holding and/or returning Ms. Nabong to a condition of peonage.

61.     As a result of this conduct, Ms. Nabong has suffered damages in an amount to be determined at trial.

62.     Pursuant to 18 U.S.C. Section 1595(a), which provides for recovery of civil damages for violations of Section 1581, Ms. Nabong is entitled to recover damages, including punitive damages, and reasonable attorneys' fees for this wrongful conduct.

## SECOND CLAIM FOR RELIEF

**Trafficking Victims Protection Reauthorization Act**
**Sale into Involuntary Servitude**
**18 U.S.C. §§ 1584, 1585**
(Against both Defendants)

63.     Plaintiff restates and incorporates Paragraphs 1 through 55 of the Complaint as if fully stated herein.

64.     The sale into involuntary servitude provision of the TVPRA, 18 U.S.C. § 1584, provides:  "Whoever knowingly and willfully holds to involuntary servitude or sells into any condition of involuntary servitude, any other person for any term, or brings within the United States any person so held, shall be fined under this title or imprisoned not more than 20 years, or both."

65.     22 U.S.C. Section 7102(5) provides:  "The term 'involuntary servitude' includes a condition of servitude induced by means of (A) any scheme, plan, or pattern intended to cause a person to believe that, if the person did not enter into or continue in such condition, that person or another person would suffer serious harm or physical restraint; or (B) the abuse or threatened abuse of the legal process."

66.     Paddayuman knowingly and willfully held Ms. Nabong in a condition of involuntary servitude, forcing her to work grueling hours in inhumane conditions without paying her the compensation required by law.

67.     Paddayuman and Sy knowingly and willfully brought Ms. Nabong from the Philippines to the United States for the purpose of holding her in this condition of involuntary servitude.

68.     Paddayuman, through lies, threats, and intimidation, knowingly and willfully caused Ms. Nabong to believe that if she did not work for her she would be subjected to criminal prosecution by U.S. and Filipino officials, deportation.  Paddayuman accomplished this by installing in her house surveillance cameras and an alarm to which Ms. Nabong did not know the code; issuing verbal threats; insinuating that she could call upon family and friends in the United States and Filipino governments to punish Ms. Nabong for any insubordination; and sexually harassing and abusing her.  These tactics also prevented Ms. Nabong from leaving the house at 6109 Lundy Place in Burke, Virginia unsupervised or interacting with anyone in the United States outside of Paddayuman's family, thus preventing her from seeking assistance with or escape from her condition.

69.     As a result of this conduct, Ms. Nabong has suffered damages in an amount to be determined at trial.

70.     Pursuant to 18 U.S.C. Section 1595(a), which provides for recovery of civil damages for violations of Section 1584, Ms. Nabong is entitled to recover damages, including punitive damages, and reasonable attorneys' fees for this wrongful conduct.

**THIRD CLAIM FOR RELIEF**

**Trafficking Victims Protection Reauthorization Act**
**Forced Labor**
**18 U.S.C. §§ 1589, 1595**
(Against both Defendants)

71.     Plaintiff restates and incorporates Paragraphs 1 through 55 of the Complaint as if fully stated herein.

72.     The forced labor provision of the TVPRA, 18 U.S.C. Section 1589(a), provides: "Whoever knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person; (2) by means of serious harm or threats of serious harm to that person or another person; (3) by means of the abuse or threatened abuse of law or legal process; or (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint, shall be punished as provided under subsection (d)."

73.     Paddayuman knowingly and willfully held Ms. Nabong captive in her house and forced her to work grueling hours in inhumane conditions without paying her the compensation required by law.

74.     Paddayuman, through lies, threats, and intimidation, knowingly and willfully caused Ms. Nabong to believe that if she did not work for her family she would be subjected to criminal prosecution by U.S. and Filipino officials, deportation, or sexual violence.  Paddayuman accomplished this by installing in her house surveillance cameras and an alarm to which Ms. Nabong did not know the code; issuing verbal threats; insinuating that she could call upon family and friends in the U.S. and Filipino governments to punish Ms. Nabong for any insubordination;

and standing by while her husband sexually harassed and abused her.  These tactics also prevented Ms. Nabong from leaving the house at 6109 Lundy Place unsupervised or interacting with anyone in the United States outside of Paddayuman's family, thus preventing her from seeking assistance with or escape from her condition.

75.     Sy was knowledgeable and complicit in the scheme to obtain Ms. Nabong's services, helping bring Ms. Nabong to the United States for that purpose.

76.     As a result of this conduct, Ms. Nabong has suffered damages in an amount to be determined at trial.

77.     Pursuant to 18 U.S.C. Section 1595(a), which provides for recovery of civil damages for violations of Section 1589, Ms. Nabong is entitled to recover damages, including punitive damages, and reasonable attorneys' fees for this wrongful conduct.

## FOURTH CLAIM FOR RELIEF

**Trafficking Victims Protection Reauthorization Act**
**Trafficking Into Servitude**
**18 U.S.C. §§ 1590, 1595**
(Against both Defendants)

78.     Plaintiff restates and incorporates Paragraphs 1 through 55 of the Complaint as if fully stated herein.

79.     The trafficking into servitude provision of the TVPRA, 18 U.S.C. § 1590, provides:  "Whoever knowingly recruits, harbors, transports, provides, or obtains by any means, any person for labor or services in violation of [laws prohibiting peonage, slavery, involuntary servitude, or forced labor] shall be fined under this title or imprisoned not more than 20 years, or both."

80.     As set forth herein, Paddayuman and Sy knowingly and willfully recruited, harbored, transported, provided, and/or obtained Ms. Nabong to provide labor and services to

Paddayuman, in violation of laws prohibiting peonage, slavery, involuntary servitude, and forced labor.

81.     As a result of this conduct, Ms. Nabong has suffered damages in an amount to be determined at trial.

82.     Pursuant to 18 U.S.C. Section 1595(a), which provides for recovery of civil damages for violations of Section 1590, Ms. Nabong is entitled to recover damages, including punitive damages, and reasonable attorneys' fees for this wrongful conduct.

## FIFTH CLAIM FOR RELIEF

**Trafficking Victims Protection Reauthorization Act**
**Unlawful Conduct With Respect to Documents in Furtherance of Trafficking, Peonage,**
**Slavery, Involuntary Servitude, or Forced Labor**
**18 U.S.C. §§ 1592, 1595**
(Against both Defendants)

83.     Plaintiff restates and incorporates Paragraphs 1 through 55 of the Complaint as if fully stated herein.

84.     The unlawful conduct with respect to documents in furtherance of trafficking, peonage, slavery, involuntary servitude, or forced labor provision of the TVPRA, 18 U.S.C. § 1592, provides:  Whoever knowingly destroys, conceals, removes, confiscates, or possesses any actual or purported passport or other immigration document, or any other actual or purported government identification document, of another person—

> (1) in the course of a violation of section 1581, 1583, 1584, 1589, 1590, 1591, or 1594(a);

> (2) with intent to violate section 1581, 1583, 1584, 1589, 1590, or 1591; or

(3) to prevent or restrict or to attempt to prevent or restrict without

lawful authority, the person's liberty to move or travel, in order to

maintain the labor or services of that person, when the person is or

has been a victim of a severe form of trafficking in persons, as

defined in section 103 of the Trafficking Victims Protection Act of

2000, if that conduct is caused by, or incident to, that trafficking.

shall be fined under this title or imprisoned for not more than 5 years, or both."

85.     Paddayuman and/or Sy knowingly and willfully possessed and altered the World

Bank Group standard Contract for G-5 Domestic Employee and/or other immigration documents

that were submitted as part of the application for Ms. Nabong's G-5 domestic employee visa, and

did so in the course of and with the intent to traffic Ms. Nabong from the Philippines to the

United States and subject her to peonage, involuntary servitude, and forced labor.

86.     As a result of this conduct, Ms. Nabong is a victim of a severe form of trafficking

in persons and has suffered damages in an amount to be determined at trial.

87.     Pursuant to 18 U.S.C. § 1595(a), which provides for recovery of civil damages for

violations of Section 1592, Ms. Nabong is entitled to recover damages, including punitive

damages, and reasonable attorneys' fees this wrongful conduct.

## SIXTH CLAIM FOR RELIEF

**Fair Labor Standards Act of 1938**
**Federal Minimum Wage and Overtime Pay**
**29 U.S.C. §§ 206, 207, 216(b)**
(Against Defendant Ofelia Paddayuman)

88.     Plaintiff restates and incorporates Paragraphs 1 through 55 of the Complaint as if

fully stated herein.

89.     Ms. Nabong and Paddayuman were in an employment relationship within the meaning contemplated by 29 U.S.C. Section 203(d)-(g) from March 24, 2014 until or around May 6, 2014.

90.     29 U.S.C. Section 206(a) provides that "[e]very employer shall pay to each of his employees" the federal minimum wage, and Section 206(f) provides that "Any employee (1) who in any workweek is employed in domestic service in a household shall be paid wages at a rate not less than the [the federal minimum wage] . . . ."

91.     The federal minimum wage from March 24, 2014 through May 6, 2014 was $7.25 per hour.

92.     Paddayuman willfully and knowingly failed to pay Ms. Nabong the statutory minimum wage for her services in violation of 29 U.S.C. Section 206.

93.     Pursuant to 29 U.S.C. Section 216(b), Ms. Nabong is entitled to recover the amount of her unpaid minimum wages and overtime, and an additional equal amount as liquidated damages, attorneys' fees, and costs.

## SEVENTH CLAIM FOR RELIEF

**Virginia Minimum Wage Act**
**Va. Code Ann. §§ 40.1-28.10, 40.1-28.12**
(Against Defendant Ofelia Paddayuman)

94.     Plaintiff restates and incorporates Paragraphs 1 through 55 of the Complaint as if fully stated herein.

95.     The Virginia Minimum Wage Act, Va. Code. Ann. § 40.1-28.10, provides: "Every employer shall pay to each of his employees' wages at a rate not less than the federal minimum wage and a training wage as prescribed by the U.S. Fair Labor Standards Act (29 U.S.C. § 201 *et seq.*)."

96.     As set forth above, Paddayuman willfully and knowingly failed to pay Ms.

Nabong the statutory minimum wage for her services in violation of the FLSA.

97.     Pursuant to Va. Code Ann. § 40.1-28.12, Ms. Nabong is entitled to recover

the amount of her unpaid minimum wages, plus interest at eight per centum per annum upon

such unpaid wages, interest from the date or dates said wages were due, and reasonable

attorneys' fees.

### EIGHTH CLAIM FOR RELIEF

**Virginia Labor and Employment Law**
**Time and Medium of Payment**
**Va. Code. Ann. § 40.1-29**
(Against Defendant Ofelia Paddayuman)

98.     Plaintiff restates and incorporates Paragraphs 1 through 55 of the Complaint as if

fully stated herein.

99.     Va. Code Ann. Section 40.1-29(a)(1) provides that "[a]ll employers operating a

business . . . shall pay salaried employees at least once each month and employees paid on an

hourly rate at least once every two weeks or twice in each month . . ." and "[u]pon termination of

employment an employee shall be paid all wages or salaries due him for work performed prior

thereto; such payment shall be made on or before the date on which he would have been paid for

such work had his employment not been terminated."

100.    Defendant Paddayuman employed Ms. Nabong not only for domestic service but

also for the catering business she ran with her husband, and thus was required to pay Ms.

Nabong according to Va. Code Ann. Section 40.1-29(a)(1).

101.    Defendant Paddayuman willfully and knowingly failed to pay Ms. Nabong in a

timely manner and to pay Ms. Nabong wages or salaries due to her for work performed prior to

the termination of her employment.

102.     Pursuant to Va. Code Ann. Section 40.1-29(G), Ms. Nabong is entitled to recover all wages due, plus interest at an annual rate of eight percent accruing from the date the wages were due.

## NINTH CLAIM FOR RELIEF

### Fraudulent Misrepresentation
(Against Defendant Ofelia Paddayuman)

103.     Plaintiff restates and incorporates Paragraphs 1 through 55 of the Complaint as if fully stated herein.

104.     Prior to Ms. Nabong's arrival in the United States, Paddayuman represented to her that if she came to the United States to work for her, Ms. Nabong would be generously compensated, would work reasonable set hours with weekends off, and that her job responsibilities would be limited to child care.  Contrary to that false representation, upon her arrival in the United States, Paddayuman forced Ms. Nabong into slavery.  She and her family forced Ms. Nabong to work constantly for almost no pay and, through threats and intimidation, imprisoned her in their house and alienated from the rest of society.

105.     Upon information and belief, Paddayuman never intended to gainfully employ Ms. Nabong or provide her with a humane living and working environment.  Rather, Paddayuman intended to subject Ms. Nabong to trafficking, peonage, slavery, involuntary servitude, and forced labor in violation of federal, state, and common law.  That intention is evidence through, among other things, the forging of Ms. Nabong's immigration and employment documents and Paddayuman's insistence that Ms. Nabong list the wrong person as her employer on those documents and to embassy officials, and the manner in which Ms. Nabong was threatened and overworked immediately upon her arrival in the United States and throughout her time living in the house at 6109 Lundy Place.

106.    Ms. Nabong justifiably relied on Paddayuman's misrepresentations in deciding to leave her family and her young son in the Philippines to work in the United States.

107.    As a result of Paddayuman's conduct, Ms. Nabong has suffered damages in an amount to be determined at trial.

108.    Ms. Nabong is entitled to compensatory damages and, because Paddayuman acted with actual malice, punitive damages.

## TENTH CLAIM FOR RELIEF

### Unjust Enrichment
(Against Defendant Ofelia Paddayuman)

109.    Plaintiff restates and incorporates Paragraphs 1 through 55 of the Complaint as if fully stated herein.

110.    Paddayuman was unjustly enriched because Ms. Nabong worked for her without compensation.

111.    Paddayuman falsely represented to Ms. Nabong that she would be reasonably compensated for providing in-home child care if she immigrated to the United States, and the Contract she was provided said she would be paid $8.98 per hour.  Overall, Ms. Nabong performed childcare and other services seven days a week for as many as sixteen hours a day.

112.    Paddayuman never intended to employ Ms. Nabong as a legitimate provider solely of child care, but rather intended to subject her to trafficking, peonage, slavery, involuntary servitude, and forced labor in violation of federal, state, and common law.

113.    Paddayuman received the benefit of Ms. Nabong's unpaid labor through fraudulent and unconscionable conduct.

114.    Equity and good conscience require that Ms. Nabong receive restitution.

## ELEVENTH CLAIM FOR RELIEF

### Breach of Contract
(Against Defendant Ofelia Paddayuman)

115.    Plaintiff restates and incorporates Paragraphs 1 through 55 of the Complaint as if fully stated herein.

116.    The Contract on which Ms. Nabong's signature was forged establishes a legal obligation enforceable against Paddayuman.  While Paddayuman caused the Contract to indicate that Ms. Nabong's employer was Sy, she represented to Ms. Nabong that in fact the employment relationship would be between Ms. Nabong and herself.  Moreover, while Ms. Nabong's signature on the employment Contract was forged, presumably by Paddayuman herself, Paddayuman represented that the document was a binding employment Contract between Ms. Nabong and herself, and Ms. Nabong believed that to be the case.

117.    Additionally, Paddayuman orally contracted with Ms. Nabong for the childcare services referenced in the Contract.  In exchange for traveling to the United States to care for her grandchildren, Paddayuman offered Ms. Nabong monetary compensation, the cost of her travel, and reasonable working hours.  Ms. Nabong accepted this offer of employment, creating a binding oral agreement.

118.    Paddayuman breached her contractual obligations by not compensating Ms. Nabong for the work she performed, demanding that Ms. Nabong reimburse her for her travel expenses, and subjecting Ms. Nabong to grueling and inhumane working hours and working conditions.

119.    As a result of Paddayuman's conduct, Ms. Nabong has suffered damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, for the above foregoing reasons, Plaintiff respectfully prays that this Court find in favor of Plaintiff and against Defendants, and each of them, and order the following relief:

a. General, compensatory, and special damages in an amount to be proven at trial;

b. Unpaid wages, including minimum wages and overtime premiums, in an amount to be proven at trial;

c. Statutory penalties and liquidated damages in an amount to be proven at trial;

d. Punitive and exemplary damages in an amount to be proven at trial;

e. Liquidated damages pursuant to the FLSA;

f. Pre- and post-judgment interest;

g. Reasonable attorneys' fees and costs; and

h. Any and all other legal and equitable relief this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all issues so triable.

Dated: March 6, 2017

By: /s/ Robert Stern
Robert Stern (D.C. Bar No. 478742)
Daniel Streim (D.C. Bar No. 1023478)
Orrick, Herrington & Sutcliffe LLP
Columbia Center
1152 15th Street NW,
Washington, D.C. 20005
Telephone: 202-339-8400
Facsimile: 202-339-8500
rstern@orrick.com
dstreim@orrick.com
*Counsel for Plaintiff*